The First National Bank of Danville *v.* Alfred Creveling, George W. Miles and Henry Levis, Copartners now or late trading as Creveling, Miles & Co., Limited, Appellants.

*Limited partnership association—Schedule—Description of real estate—Omitting of lien—Act of June 2, 1874.*

Under the limited partnership association act of June 2, 1874, P. L. 271, as amended by the act of May 1, 1876, P. L. 89, a schedule which enumerates real estate as contributed at a certain valuation, without any reference whatever to an existing lien on the real estate, is defective, and the members of the association are liable for its debts as general partners.

*Limited partnership association—Subscription books—Payment of subscriptions—Act of June 2, 1874.*

Failure to keep a subscription list book by a limited partnership association organized under the act of June 2, 1874, renders the association a general partnership.

The articles of a limited partnership association under the act of June 2, 1874, must provide a fixed time at which subscriptions to the capital should be paid.

Argued March 25, 1896.   Appeal, No. 196, July T., 1895, by defendants, from judgment of C. P. No. 4, Phila. Co., March T., 1889, No. 32, on referee's report.   Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and DEAN, JJ.   Affirmed.

Exceptions to referee's report.

The case was referred to Mayor Sulzberger, Esq., who reported as follows :

In this case the plaintiff instituted an action of assumpsit against the defendants, and, by the statement filed, claimed to be the holder of a promissory note for $5,000 made by Creveling, Miles & Co., Limited, A. Creveling, chairman, George W. Miles, manager, dated Danville, Pa., February 25, 1885, payable three months after its date to the order of A. H. Reynolds, stating that as collateral therefor there had been deposited six bonds of $1,000 each, Nos. 4 to 9 inclusive, and one of $500, Creveling, Miles & Co., Limited, with power of sale.

The note was indorsed by A. H. Reynolds, and credits were indorsed upon it to the amount of $1,180 as of the following dates : November 14, 1885, $230 ; August 17, 1886, $100 ; October 30, 1886, $100 ; December 2, 1886, $100 ; April 19, 1887, $650.

The amount the plaintiff sought to recover was the balance due, $3,820, with interest.

The defendant, Henry Levis, filed an affidavit of defense, wherein he set out in substance that the defendants were not general partners ; that on March 29, 1880, they had formed a partnership limited association under the statutes ; had capitalized the same at $99,000, $75,000 of which capital was subscribed in real estate as set forth in the certificate of incorporation, which was duly recorded at Philadelphia in Partnership Limited Book No. 1, page 350, etc., and he further averred that he had fully complied with the requirements of said act of assembly of Pennsylvania and its supplements and that said partnership limited association was dissolved by operation of law prior to the bringing of the suit.   He further averred that the note in question was not given in due course of business of Creveling, Miles & Co., Limited, and was in excess of the amount authorized by law ; that it is illegal and void and was not in the form required by law and was given without his knowledge or

consent, in fraud of his right, of which the plaintiff had due notice; and that if A. Creveling did make such note it was not by virtue of his position as chairman, of which the plaintiff had due notice.   As an additional averment he set forth that he believed and expected to prove that the note was given to the plaintiff by collusion of its officers with A. Creveling and A. H. Reynolds in fraud of the defendant's rights and in fraud of the rights of Creveling, Miles & Co., Limited, and was without consideration.

Two main questions are to be considered: First, are the defendants liable as general partners?   Second, if they are, what amounts are the plaintiffs respectively entitled to recover? Are the defendants liable as general partners?   On March 29, 1880, the defendants associated themselves together to form a partnership limited, under the act of June, 1874, and its supplements.   The articles were written, acknowledged and recorded, and if the parties thereto did in all respects conform to' the law they are entitled to protection against general liability. By the terms of those articles, a copy of which is hereto appended, marked "Exhibit S," the amount of the capital of the partnership association was stated at $99,000, consisting, first, of certain real estate described in the schedule annexed to the articles at a valuation of $75,000, fixed upon it and approved by all the members subscribing to the capital of said association, of which Alfred Creveling is said to have contributed $25,000, George W. Miles $25,000 and Henry Levis $25,000.   The capital consisted further, according to the articles, of the sum of $24,000 in cash, of which Alfred Creveling had subscribed $8,000, George W. Miles had subscribed $8,000 and Henry Levis had subscribed $8,000, fifty percentum of which cash subscription "shall be paid to the treasurer of the said association on or before the first day of June, 1880, and the balance at such times and in such installments as may be called for by the managers of said partnership association limited."   The schedule annexed to these articles of association is as follows:

"Being a description of the real estate mentioned and referred to and forming a part of the foregoing certificate and statement of Creveling, Miles & Co., Limited, contributed to the capital stock thereof at a valuation of $75,000, in equal

portions, by the members thereof, to wit: All that certain tract of land and the furnace thereon erected, situate in Point Township, Northumberland County, State of Pennsylvania, containing one hundred and fifty-four acres and one hundred and forty-two perches, strict measure.

" We, the undersigned, do hereby certify and declare that the foregoing schedule is a true and correct description of the real estate contributed by us to the association of Creveling, Miles & Co., Limited, at a valuation of $75,000, approved by us, who are all the members subscribing to the capital of said association.

" Witness our hands this twenty-ninth day of March, in the year of our Lord 1880.

(Signed)     " ALFRED CREVELING,
" HENRY LEVIS,
" GEORGE W. MILES."

As to this item of real estate contributed in equal proportions by the members of the firm and agreed upon by them to be appraised at $75,000, the circumstances were as follows:

About four or five months prior to the formation of the partnership limited, Creveling, Miles and Levis became general partners under the name of Creveling, Miles & Co. What amount, if any, they contributed to the formation of the general partnership does not appear. At all events, they started it by purchasing from Isaac Watermann the Chulaski Furnace for $20,000, which they paid for by a purchase money mortgage to be paid off in quarterly installments of $1,250. This conveyance was made on October 11, 1879, and the business began. It was continued as a general partnership until March 29, 1880, when, by the articles, it was transformed into a partnership limited. The exact state of the accounts on March 29 does not appear, but there is an account of March 31, only two days thereafter, which for all practical purposes may be taken to have been the true state of affairs on March 29. From this account it appears that the firm was then indebted in the sum of $23,930.07, and that the value of its assets was $45,750.95, leaving a book value of $21,820.88 as the excess of assets over liabilities. In making up this statement the Chulaski Furnace property was carried at $20,366.25, and the balance due on the mortgage therefor

was stated at $18,750.   The chief item of the net assets was a charge against the Glendower Iron Works of $15,469.42.   This concern was a corporation composed of the same parties who took and handled all the product of the firm.   Whether the claim against the Glendower Iron Works was based upon a full settlement of accounts between the parties to that date is not clear.   The Glendower Iron Works' account as of the same date, on its own books, made the claim $14,831.91, and from the testimony in the case the relations between the two concerns appear to have been so intimate that there is room for the thought that their accounts may not at all times have been perfectly clear and exact.   This, in view of the fact that the members of the partnership association were also members of the corporation would not be surprising.   When the partnership association was organized no change was made in the running of the business, and the old books of the general partnership were used as theretofore.   An examination of the ledger of the firm shows the following curious facts: Neither of the partners received any credit for capital put into the partnership, and the presumption is that they invested none.   Creveling's account has as its first entry a charge to it of cash withdrawn on June 30, 1880, of $20.00, and as its first credit it has four items dated December 31, 1880, nine months after the formation of the partnership limited, "by furnace property and furnace account," $42,217.99. This is carried down on January 1, 1881, as a balance to the credit of A. Creveling of $42,197.99.   On February 28, 1881, he is charged with profit and loss of $531.33, and on December 31, 1881, there are two series of entries, one a debit series and the other a credit series, in which, on the debit side, Creveling has charged back to him the $42,217.99 which were credited to him at the beginning of the year, and has credited back to him the $531.33 which were charged to him on February 28, 1881; so that on December 31, 1881, all the entries up to that time made canceled each other, and his account stood as if it had been left blank.   Thereupon, on the same day, a new start is made by crediting him on December 31, 1881, furnace account, $25,000; and a charge is made of capital stock, $33,000, leaving due by him on January 1, 1882, $8,000, being the amount of cash capital to be contributed.

The accounts of George W. Miles and Henry Levis present

substantially the same state of facts, except that after January, 1882, there are additional entries in the account of Henry Levis. These were all made on July 17, 1885. On that date Henry Levis was credited with cash, $8,831.33, and was charged with interest, $1,231.33, leaving a balance due by him of $400.

Two other noteworthy items appear in the profit and loss account; one on February 28, 1881, shows a division of $15,000 among the partners, $5,000 to each; and another division on July 30, 1881, of $6,250, presumably $2,083.33 to each.

In considering whether, under these circumstances, the defendants have brought themselves within the protection of the act, it must not be forgotten that at the common law persons who procure goods on credit, or incur other obligations, are bound to pay for them out of any estate they have or may acquire.

The limitation of this liability to a special fund is a privilege that may lawfully be obtained by virtue of the formation of a corporation, a special partnership or a partnership limited. The price demanded by the law for the acquisition of this privilege is, however, a strict compliance with the requisitions of the acts of assembly: Maloney v. Bruce, 94 Pa. 252.

In the case before us such a strict compliance is denied in the following respects: (1) It is contended that this was a mere continuation of a prior general partnership; (2) that the certificate is not in proper form; (3) that the property is misdescribed therein; (4) that the property is not stated to be subject to a mortgage; (5) that the valuation of the real estate was so grossly excessive as to be fraudulent; (6) that the cash was never paid in; (7) that there was no subscription list book.

As to the first contention the referee finds as a fact that the business of the partnership limited was a mere continuation of that of the prior general partnership; but while this is so, it does not appear to him that that fact alone has any legal significance. A general partnership may by complying with the proper forms convert itself into a partnership limited. The mere fact that the books of the old firm continued to be used would not seem to be fatal, since there is no provision in the act requiring the use of new books; nor, indeed, is the use of any book whatever specifically commanded, except the subscription list book. The use of the old books, at all events, seems

due merely to incompetency or injudicious economy, and not to any design to evade the statute or commit fraud.

The second point, that the certificate is not in proper form, is more important.   By the act of 1874 it is not necessary for a valid organization that the entire subscribed capital should be paid into the treasury before an association can begin business, but the statement must show when, and in what amounts, the subscriptions are to be paid; and the subscription list book is evidently provided in order that it may thereafter show the payment, or the failure to pay the installments falling due after the recording of the statement.   The purpose of the act is that the capital shall alone be liable for the debts of the association, whence the importance of precisely stating in the articles what it is, and when and how it is to be contributed.   Unfortunately for the defendants in this case, their statement that the remainder of the capital stock of the partnership association, amounting to $24,000, fifty per centum of which should be paid on or before June 1, 1880, and the balance at such times and in such installments as might be called for by the managers of the association, does not answer the requirements of the statute.   The statute does not allow the capital to be payable upon a mere contingency, least of all on a contingency which cannot happen except at the will of the partners.   The articles of association, as was remarked by Mr. Justice WILLIAMS in Hill v. Stetler, 127 Pa. 161, are not in the form of a contract between the partners, but of a certificate for the information of the public.   If at the time of the making of the articles the members had agreed when the last fifty per cent should be paid, it was their duty to impart this information to the public.   If, on the other hand, they had not agreed, then there was no time fixed for the payment of that balance, and the failure to fix such a time was a fatal defect which rendered the articles ineffective to create a partnership limited under the act.   This rule will seem harsh and technical only to him who loses sight of the basis of the act of 1874, namely, the capital must be contributed for the protection of the creditors.   By this contribution assets are received upon which the business may be conducted.   If, however, for the actual contribution of the assets at the formation of the partnership or at a specified time thereafter, the partners substitute an indefinite undertaking to pay when they will, the business is

hampered, its chances of success reduced and a vague promise is made to do duty for the substantial capital contemplated by the statute. How this will work the case in hand illustrates. Two of the three partners are confessedly insolvent, and a call now made would be practically fruitless.

As to the third and fourth points : The referee is of opinion that it was the duty of the defendants to describe exactly the property contributed to the firm. The contributed property was in effect an equity of redemption in the Chulaski Furnace property, which might have been set forth and described in any one of several forms. The mere description of the real estate was accurate enough if the statement had also been made that it was subject to a purchase money mortgage of $20,000, of which $1,250 had been paid. The failure to do this leaves even the valuation doubtful, for it may be thought on the one hand that the whole property is worth $75,000, considered clear of incumbrances ; or, on the other hand, that the equity of redemption is worth $75,000. If the valuation of the whole property were $75,000, the effect of it in this case would be to render the whole statement false, because as the $75,000 would be subject to a deduction of $18,750, it would follow that the net value of the property as put in the firm was but $56,250 ; and as the additional capital subscribed was but $24,000, the whole capital would be $80,250, instead of $99,000, as set forth by the articles. Such vagueness and inaccuracy violate the purpose of the act, and the referee is of the opinion that in this respect also the certificate is ineffective to create a valid partnership limited under it. Indeed, it may well be doubted whether mortgaged property can be made part of the capital contributed to such an association. There is no power conferred to appraise the balance of value after the payment of any indebtedness upon the property contributed, and it is with wise intent that the legislature has omitted to confer such power. The debt is a fixed quantity. Opinions of value are shifting, and there is every motive in the associates to enhance their standing in the community and their power to gain credit by placing the valuation of the property contributed as high as possible. In a case like that before us, where the property contributed is owned equally by all the contributors, there is no loss or injury to any of them by appraising the property at many times its value. If the stat-

ute be interpreted to mean that mortgaged property can be so contributed, then property mortgaged to its full value may be made to appear as valuable capital by simply doubling or trebling the valuation, and deducting from the same the amount of the fixed quantity, to wit, the debt.   Thus worthless assets may be made to figure as an imposing capital, and that without any conscious fraud on the part of the associates, but merely by their natural action under the stimulus of hope and ambition. To impute to the legislature so unwise an intention without plain and specific words constraining us, would be contrary to the plainest principles of interpretation.

As to the fifth point: The lack of certainty in the valuation renders it difficult to discuss this point.   In order to be able to say that a valuation is grossly excessive we must first know what such valuation is ; but, as has been shown, there is a doubt left on this subject.   The object of the law is, that where the capital of a partnership is contributed in assets other than money, a true valuation of such assets should be made.   It is inconceivable that any law should contemplate an appraisement or any other proceeding not true.   Where the truth, however, is not ascertainable by a fixed rule or standard and must remain a matter of opinion, it is always an embarrassing question to determine whether the opinion is given honestly and carefully, or dishonestly and negligently.   The law having thrown upon the partners the duty of making the appraisement, the presumption is that they made it without fraud, and if any is alleged it must be proved.   The evidence in this case does not satisfy the referee that there was any fraud in the appraisement.   The statute appears to have been drawn with the thought that the conflicting interests of the partners would induce such a careful supervision of the price at which goods are put in by the several partners that the appraisement by the partners would be a sufficient protection to the public.   The legislative mind does not seem to have considered that a contingency could happen such as has actually happened in this case, namely, that the partners being tenants in common of one piece of property, and being equal partners in the new concern, could without danger to their several interests appraise the property so held at many times its real value.   There would seem to be room for an amend-

ment to the statute providing for the ascertainment of the value of such assets by appraisers appointed by the courts.

As to the sixth point, that the cash was never paid in, the referee does not see that this in any manner affects the legality of the formation of the partnership.

As to the seventh point, that there was no subscription list book: This is a matter of very grave importance. The statute itself is imperative that such a subscription list book shall be kept and shall be open to the inspection of creditors and members of the association at all reasonable times. The obvious reason for this enactment is, that where a portion of the capital remains unpaid at the time of the formation of the partnership limited, persons interested have a right to know how much is unpaid, and when the time for the payment thereof has arrived. Defaults in such payment can thus become known and their effects warded off or minimized by prompt action or refusal to give further credit. If such a book ever existed the fact would naturally be capable of proof, but the evidence in this case is entirely too vague and insufficient to warrant the conclusion that there was such a book. The rule attempted to be set up by the defendant, namely, that it is the duty of a creditor to prove affirmatively that the book did not exist, seems to be unwarranted. The defendants are not in this respect charged with fraud. The question is : Have they complied with the statute ? As they are unable to show the book or to declare with any degree of positiveness that it ever existed, the referee finds that the partnership limited kept no subscription list book as required by the act of assembly. Under all the circumstances it appears to the referee that the defendant Levis is not justified in the contention that it is a hardship as to him specially so to rule as to charge him with liability. He was or ought to have been aware of everything that was done or omitted to be done. He was a member of the firm of Creveling, Miles & Co. before the partnership limited was formed; he assisted in the formation of the partnership limited and became and remained a member of it; and though perhaps only a nominal shareholder in the Glendower Iron Works, he was its treasurer. The peculiar nature of the business could not have been unknown to him. Starting apparently without capital about October, 1879, Creveling, Miles & Co., on March 29, 1880, without the investment of another

dollar (excepting only the profits earned during these few months), became a partnership limited with a capital of $99,000, of which only $24,000 remained to be paid up, one half on June 1, 1880, and the other half at the call of the managers. No payment was made on June 1, 1880, and no call was ever made, but each partner drew out of this business, apparently as profits on February 28, 1881, $5,000, and on July 30, 1881, $2,083.33, an aggregate of $21,250. From the best evidence accessible the concern practically ceased business some time in 1884, and on July 17, 1885, the board held a meeting in Philadelphia at Mr. Levis' office, at which, according to the testimony, Mr. Levis produced money to the amount of $8,831.33, and handed it over to the treasurer of the concern, who at the same meeting handed it back to him. The result of this transaction is thus noted in Henry Levis' account on the books of Creveling, Miles & Co. He is credited with $8,831.33, and is debited with interest on his unpaid installment of $8,000, $1,231.33, in all, $9,231.33 leaving a balance of unpaid capital due by him of $400. The cash $8,831.33 is disposed of on the books by two entries:

| | |
|---|---:|
| Bills payable . . . . . . . | $8,373 50 |
| Interest     . . . . . . | 421 29 |
| | $8,794 79 |

The disposition of the small balance of $36.54 is unexplained. The item of bills payable thus paid to Henry Levis was an overdue note of the partnership negotiated by Henry Levis & Co. in April, 1884.

From all the circumstances the referee is bound to believe and to find that on July 17, 1885, the firm of Creveling, Miles & Co., Limited, was insolvent, and that its overdue promissory note was in effect on that day contributed by Henry Levis for the purpose of payment on account of his overdue installment with interest. This act, however sincerely meant, cannot be allowed to have the contemplated effect. The installments were not in any event payable in promissory notes, and no arrangements could be made between the partners by which the liability to contribute capital could be extinguished by mere bookkeeping or by passing bank notes backwards and forwards.

For the reasons above stated, under the head of second, third,

fourth and seventh points, the referee is of opinion and finds that the defendants are answerable to the plaintiff as general partners.

As to the amount which the plaintiff is entitled to recover, the referee finds that

| | | |
|---|---|---|
| The amount of the note sued on was . . . | $5,000 | 00 |
| Total credits . . . . . . . | 1,180 | 00 |
| Balance . . . . . . | $3,820 | 00 |
| Interest from May 25th, 1885, to January 2d, 1895, on principal as reduced from time to time. . | 2,588 | 67 |
| | $6,408 | 67 |

The referee therefore gives judgment as of this date, January 2, 1895, in favor of the plaintiff and against the defendants for the sum of $6,408.67.

*Errors assigned* were in dismissing exceptions to referee's report.

*John G. Johnson*, with him *George Frederick Keene* and *Charles C. Lister*, for appellants.—If this court should hold that persons who contribute a property of which they give and record an exact description, can be held liable as general partners in case a jury shall be of the opinion that the valuation was excessive, the limited liability act will be practically repealed. Juries would determine a question of past bona fides by the light of subsequent failure. No one would be safe in entering into a joint stock company enterprise. This court by its decisions has appreciated the wisdom of holding those who, knowing what was contributed, took their chances as to value, liable for the consequences: Rehfuss v. Moore, 134 Pa. 473; Cock v. Bailey, 146 Pa. 340; Laflin & Rand Co. v. Steytler, 146 Pa. 443.

Where it was intended to prescribe a penalty of general liability the intention was expressed. It would be monstrous to hold every member of a limited association liable generally, because of a failure to keep a subscription list book: Lauder v. Logan, 123 Pa. 39; Hill v. Stetler, 127 Pa. 157.

All that the act requires is, that the public shall be informed of the amount that has been subscribed and of the manner in which it has been agreed to pay the same.

We submit that the doubt of the referee as to whether or not real estate subject to mortgage can be contributed has been resolved by this court: Cock v. Bailey, 146 Pa. 341; Cox v. Watts, Twells & Co., 33 W. N. C. 124.

*John Marshall Gest* and *Richard C. Dale*, with them *Edmund G. Butler*, for appellee.—The association kept no subscription book, as required by the act of 1874: Maloney v. Bruce, 94 Pa. 252; Eliot v. Himrod, 108 Pa. 569; Vanhorn v. Corcoran, 127 Pa. 255; Keystone Boot Co. v. Schoelkopf, 11 W. N. C. 132; Pears v. Barns, 1 Cent. Rep. 569; Hite Gas Co.'s App., 118 Pa. 436; Andrews v. Schott, 10 Pa. 47; Richardson v. Hogg, 38 Pa. 153; Conrow v. Gravenstine, 17 W. N. C. 204.

The association was a general partnership, because the articles did not provide a fixed time at which the subscription should be paid: Hill v. Stetler, 127 Pa. 161; and because of the failure to disclose the fact that the real estate contributed at a valuation of $75,000 was really incumbered by a purchase money mortgage of $20,000 less a single payment of $1,250: Bement v. Brick Machine Co., 12 Phila. 494; Vanhorn v. Corcoran, 127 Pa. 255; Cock v. Bailey, 146 Pa. 328; and because it was a mere continuation of a prior general partnership: Eliot v. Himrod, 108 Pa. 569.

OPINION BY MR. CHIEF JUSTICE STERRETT, October 5, 1896:

In this case, it was successfully contended by plaintiff bank that defendants were liable as general partners because of their failure to comply with some of the provisions of the act of June, 1874, and its supplements under which, in March, 1880, they undertook to organize themselves into a partnership association limited; and judgment was accordingly entered against them.

In October, 1879, the three defendants, above named, formed a general copartnership in the name of Creveling, Miles & Co., and soon thereafter they purchased, on credit, the property known as the Chulaski Furnace. For the entire consideration, $20,000, a purchase money mortgage was given, payable in quarterly installments of $1,250 each. The first installment was paid, but before the second became due, the partners undertook to change their general partnership into a partnership associa-

tion, limited, under the act aforesaid. In their recorded articles of association, etc., they certified that the amount of the capital of said partnership association, limited, was ninety-nine thousand dollars, ($99,000) consisting of, first, real estate described in schedule annexed thereto, etc., at a valuation of seventy-five thousand dollars ($75,000) fixed upon it and approved by all the members subscribing to the capital of the association. The schedule, thus referred to as attached to and made part of the articles of association, contains the following description of the real estate mentioned and referred to as forming part of the foregoing certificate and statement of Creveling, Miles & Co., Limited, contributed to the capital stock thereof at a valuation of $75,000, in equal proportions, by the members thereof, to wit: All that certain tract of land and furnace thereon erected, situate in Point township, Northumberland county, Pennsylvania, containing one hundred and fifty-four acres and one hundred and forty-two perches, strict measure.

To this is appended the certificate of the defendants, Creveling, Levis and Miles, in which they " certify and declare that the foregoing schedule is a true and correct description of the real estate contributed by us to the association of Creveling, Miles & Co., Limited, at a valuation of $75,000, approved by us who are all the members subscribing to the capital of said association."

Not a word is said as to the purchase money mortgage incumbrance of $20,000 on which only $1,250 had been paid. It requires neither argument nor citation of authority to show that there was a manifest failure to comply with the provisions of the act in this regard. The statement not only fails to furnish any notice to creditors of the existence of the mortgage lien, but it is positively misleading in that it does not certify the character of the property " according to the fact."

Those who seek to have all the advantages of a general partnership and yet limit their liability to creditors, as contemplated by the act, must comply with all its provisions ; otherwise they will be liable as general partners. The object, in requiring a schedule of property contributed in lieu of cash, was to enable creditors to ascertain precisely of what the property consisted, and to judge of its value: Maloney v. Bruce, 94 Pa. 249 ; Van-

horn v. Corcoran, 127 Pa. 255; Gearing v. Carroll, 151 Pa. 79; Haslet v. Kent, 160 Pa. 85.

The contributed real estate, as correctly stated by the learned referee, " was in effect an equity of redemption, in the Chulaski Furnace property, which might have been set forth and described in any one of several forms. The mere description of the real estate was accurate enough if the statement had also been made that it was subject to a purchase money mortgage of $20,000 of which $1,250 had been paid. The failure to do this leaves even the valuation doubtful, for it may be thought, on the one hand, that the whole property is worth $75,000 considered clear of incumbrances; or, on the other hand, that the equity of redemption is worth $75,000. If the valuation of the whole property were $75,000, the effect of it, in this case, would be to render the whole statement false, because as the $75,000 would be subject to a deduction of $18,750, it would follow that the net value of the property as put into the association was but $56,250; and as the additional capital subscribed was but $24,000, the whole capital would be $80,250 instead of $99,000 as set forth in the articles."

For those and other reasons, the learned referee rightly concluded that the certificate is ineffective to create a valid partnership association, limited, under the act. He and the court below were also right in holding that the defendant also failed in other respects to comply with the requirements of the act in question.

We find nothing in the record that would justify us in sustaining any of the specifications of error, nor do we think that either of the questions therein presented requires further notice.

Judgment affirmed.